## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CARMEN VIDAL-HALLETT, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | No. 19 C 5105 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| SCHOOL OF THE ART INSTITUTE OF | ) | |
| CHICAGO, | ) | |
| | ) | |
| *Defendant*. | ) | |

### MEMORANDUM OPINION AND ORDER

Carmen Vidal-Hallett is a native of Spain who has lived and worked in the United States for many years. She sued her former employer, the School of the Art Institute of Chicago ("SAIC"), for national-origin discrimination and retaliation under Title VII of the Civil Rights Act of 1964. (Dkt. 1). SAIC moves for summary judgment on both counts. (Dkt. 61). For the following reasons, the motion is granted. (*Id.*)

### BACKGROUND

SAIC hired Vidal-Hallett in March 2015 as a Project Manager. (Dkt. 53 ¶¶ 1, 3). She managed and administered large capital projects, including the planning and implementation of multiple design and construction projects. (*Id.* ¶ 4). Her duties included, among other things, preparing comprehensive progress reports on all projects under her responsibility. (*Id.* ¶ 5). Her role required strong communication, negotiation, and team-building skills. (*Id.* ¶ 6). Vidal-Hallett is also a native of Spain and speaks English with a slight accent. (Dkt. 52 at 1; Dkt. 59 ¶ 7; Dkt. 35-1 at 17). She has lived and worked in the United States for many years. (Dkt. 52 at 1).

1

When hired, Vidal-Hallett reported to Ron Kirkpatrick, then Executive Director of Design and Construction at SAIC. (Dkt. 53 ¶ 7). Kirkpatrick reported to Thomas Buechele, Vice President of Campus Operations. (*Id.*) Kirkpatrick first reviewed Vidal-Hallett's performance from March 2015 through June 2015. (*Id.* ¶ 9; Dkt. 35-3 at 13–17). He rated her accomplishments, competencies, and overall performance as 2.5 on a scale of 1 to 5, with 3 being "Meets Expectations." (Dkt. 54 ¶ 9; Dkt. 35-3 at 14). He expressed concern with the quality of Vidal-Hallett's work, particularly her writing, both substantively and technically. (Dkt. 54 ¶ 9; Dkt. 35-3 at 14).

Kirkpatrick again evaluated Vidal-Hallett's performance from July 2015 through June 2016. (Dkt. 53 ¶ 10; Dkt. 35-3 at 19–26). He gave her a "3" rating on the 1 to 5 scale, indicating that her performance "Meets Expectations." (Dkt. 53 ¶ 10; Dkt. 35-3 at 23). But he also noted three areas in which she would "need to do better in order to continue her professional growth" at SAIC: (1) becoming more reliably focused on specific project details; (2) consistently and correctly maintaining her project records; (3) improving her written communication with others. (Dkt. 53 ¶ 10; Dkt. 35-3 at 24). Finally, Kirkpatrick reviewed her performance from July 2016 through June 2017. (Dkt. 53 ¶ 11; Dkt. 35-3 at 28–32). He rated her performance as "M" for "Meeting Most Expectations," the second lowest of a 4-tiered scale. (Dkt. 53 ¶ 11; Dkt. 35-3 at 29–30). This rating indicated that Vidal-Hallett's "[p]erformance is at the expected level in most areas; however, improvement is needed in a few areas." (Dkt. 53 ¶ 11; Dkt. 35-3 at 31). He noted some improvements in her written communication. (Dkt. 53 ¶ 11; Dkt. 35-3 at 29).

Kirkpatrick resigned his position with SAIC in July 2017, and Buechele directly supervised Vidal-Hallett until SAIC hired Kirkpatrick's replacement in November 2017. (Dkt. 53 ¶¶ 8, 12;

Dkt. 59 ¶ 12). Buechele and Vidal-Hallett dispute whether ever they discussed his opinion of her job performance. (*Compare* dkt. 53 ¶ 12 *and* dkt. 59 ¶¶ 13–14).

Chiaka Patterson was hired in November 2017 and began supervising Vidal-Hallett. For the first several months, Vidal-Hallett believed things were going well with her new supervisor. (Dkt. 59 ¶ 2). But on March 14, 2018, Vidal-Hallett met with Patterson for their regularly weekly one-on-one meeting. (*Id.* ¶ 3). She was surprised when Patterson presented her with a negative performance evaluation for the period between November 14, 2017,[1] and March 1, 2018, along with a 60-day Performance Improvement Plan ("PIP"). (*Id.* ¶ 3; Dkt. 53 ¶ 14; Dkt. 35-4 at 11–15; Dkt. 53-1 at 3–15; Dkt. 35-4 at 17–20). Before this meeting, Patterson had not told Vidal-Hallett that her job performance was so deficient that she could be fired. (Dkt. 59 ¶ 1).

On the evaluation, Patterson rated Vidal-Hallett's accomplishments, competency, and overall performance as "U" for "Unsatisfactory," the lowest of four possible ratings. (Dkt. 53 ¶ 14; Dkt. 35-4 at 13–14). She wrote that "there is significant improvement that must occur for [Vidal-Hallett] to be successful" in her role. (Dkt. 53 ¶ 14; Dkt. 35-4 at 11). The review outlined Patterson's opinions about several deficient areas in Vidal-Hallett's job performance. (Dkt. 53 ¶¶ 18–20). Patterson also critiqued her handling of two specific projects and noted that she needed to improve her substantive communication with Patterson. (*Id.* ¶¶ 15–17). Vidal-Hallett later responded to Patterson's critiques with detailed explanations, contradicting Patterson's version of events with her own. (Dkt. 59 ¶¶ 4–5; Dkt. 53-1 at 3–13).

The PIP identified several performance gaps including: (1) communicating accurate and timely status of projects; (2) becoming more reliably focused on specific project details; (3)

---

[1] The performance evaluation notes the covered period as "11/14/2018 To 03/01/2018." (Dkt. 35-4 at 11). The year in the first date appears to be a typo, however, because the parties agree that Patterson became Vidal-Hallett's supervisor in November 2017 when she was hired to replace Kirkpatrick, and she wrote the review and presented it to Vidal-Hallett at their March 2018 meeting. (Dkt. 53 ¶¶ 8, 14).

providing active leadership and taking responsibility to ensure that all project issues and client concerns are brought to a timely and successful close; (4) demonstrating ability to comprehensively plan, execute, problem solve, and close complex projects; and (5) being more responsive to resolving client issues in a timely fashion. (Dkt. 35-4 at 17–18; Dkt. 53 ¶ 23). It also set seven general performance expectations, which would be assessed every two weeks going forward, and four date-specific expectations. (Dkt. 35-4 at 18–20; Dkt. 53 ¶¶ 24–25).

Within the general expectation that she "[b]ecome more reliably focused on specific project details," the PIP stated four standards to uphold, including that Vidal-Hallett was expected to "[e]nsure all Procore project communication modules are complete, accurate, and proofed for grammer [sic]." (Dkt. 35-4 at 17; Dkt. 53 ¶ 26). Vidal-Hallett took the stated expectation as a discriminatory reference to her status as a non-native English speaker. (Dkt. 59 ¶ 7; Dkt. 35-2 at 66:16–67:23). She told Patterson: "I think this is discriminatory about my way of expressing myself." (Dkt. 35-2 at 67:24–68:1). Patterson denied that the comment was discriminatory. (Dkt. 59 ¶ 7).

Vidal-Hallett then went to Human Resources, in shock, to find out whether the sudden PIP was legal because it came without warning. (*Id.* ¶ 10). She told Jevoid Simmons, Director of Human Resources, that one of the grounds for the PIP was her alleged deficiencies with English grammar and writing, and that she believed this was unlawful discrimination. (*Id.* ¶ 10; Dkt. 53-2 ¶ 23). But she also testified in her deposition that she never complained to anyone in human resources at SAIC that she felt she was the victim of discriminatory treatment. (Dkt. 35-2 at 112:19–24). She never filed a formal complaint with anyone at SAIC. (Dkt. 35-2 at 111–12).

Vidal-Hallett and Patterson had regular follow-up meetings after the PIP. (Dkt. 59 ¶ 29). At the first biweekly follow-up meeting, Patterson observed some improvement, but her assessment

also critiqued Vidal-Hallett's performance in other areas. (Dkt. 53 ¶ 27; Dkt. 35-4 at 27–31). A few weeks after the March 14 meeting, Vidal-Hallett met with Patterson and Buechele. (Dkt. 59 ¶ 11). Buechele used an English colloquialism while discussing a project, and he paused and asked Vidal-Hallett if she understood the phrase. (*Id.* ¶ 11). She felt this was offensive. (Dkt. 53 ¶ 46). She did not react in the moment, but she later told Patterson and a non-supervisor colleague that she felt insulted by the comment. (Dkt. 35-2 at 112).

Separately, shortly after the PIP meeting, Vidal-Hallett sent a survey to colleagues, both internal and external, to get feedback on her job performance. (Dkt. 59 ¶ 26; Dkt. 53 ¶ 29). The survey did not mention any allegations of discrimination. (Dkt. 53 ¶ 29). It stated only that Vidal-Hallett intended to use the results to improve her performance in the future. (*Id.*) While she had told Buechele that she was going to seek feedback from her colleagues, Patterson confronted Vidal-Hallett in early April and told her not to discuss her evaluation or PIP with anyone. (Dkt. 59 ¶ 28). Then, at Vidal-Hallett's second biweekly review, on April 17, Patterson wrote:

> Carmen consistently demonstrates her inability to independently wrap her arms around all the project details and lead the team thru [sic] effective decision making, problem solving, and timely closure of issues. Consistently, I have had to step in and invest excessive time that detracts from my ability to get work done. Her lack of understanding of project detail and deficient project management skills unnecessarily expends SAIC and contractor resources. Further, she has demonstrated insubordination and verbal disrespect to me and staff members.

(Dkt. 53 ¶ 31; Dkt. 35-4 at 33).

On April 26—more than 30 days after being placed on the PIP but before its 60-day period expired—Patterson, Buechele, and Simmons met with Vidal-Hallett. (Dkt. 59 ¶ 31). They offered her the option to either resign with a severance package from SAIC or finish out the PIP. (*Id.* ¶ 31). SAIC would hold her to a "high bar" standard if she stayed, and she would not receive a severance package if SAIC fired her for cause at the end of the PIP period. (*Id.* ¶ 31). When Vidal-Hallett

asked whether she had any chance of keeping her job if she stayed, Buechele said, "What have you proved that you can—that if you cannot prove—that you would not prove in the next two weeks?" (*Id.* ¶ 32). She was given two days to consider the options. (*Id.* ¶ 33).

On May 1, after verifying that the severance package was not negotiable to include the next year of her daughter's tuition benefits, Vidal-Hallett emailed Buechele saying, "I have decided to resign with the severance package." (Dkt. 53 ¶ 38). Her resignation was accepted. (*Id.* ¶ 38). The parties dispute whether she later retracted her decision, but she does not remember ever informing anyone at SAIC that she wanted to retract her decision, and she never signed SAIC's Settlement Agreement and General Release. (*Id.* ¶¶ 39–40; Dkt. 59 ¶ 36).

After her resignation was accepted, Vidal-Hallett filed a charge with the EEOC. (Dkt. 1-1). She received her right-to-sue letter and filed this action against SAIC alleging two violations of Title VII of the Civil Rights Act of 1964. (Dkt. 1). She claims that SAIC terminated her because of her Spanish and Brazilian heritage and her status as a non-native English speaker. (*Id.* ¶¶ 25–31). She also claims that SAIC retaliated against her for engaging in protected activity under Title VII. (Dkt. 1 ¶¶ 33–45). SAIC moves for summary judgment on both counts. (Dkt. 61).

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court construes all facts and draws all reasonable inferences in favor of the nonmoving party. *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022). "A genuine issue of material fact exists only if 'there is sufficient evidence'" for a jury to return a verdict for the nonmoving party. *Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "Speculation is not sufficient to survive

summary judgment; there must be evidence." *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 573 (7th Cir. 2021) (cleaned up and internal citations omitted).

DISCUSSION

## I.      National-Origin Discrimination

Title VII prohibits an employer from "discharg[ing] any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). The key question in a Title VII discrimination claim "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *see also Abebe v. Health & Hosp. Corp. of Marion Cnty.*, 35 F.4th 601, 606 (7th Cir. 2022) (quoting same). "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself." *Khungar*, 985 F.3d at 573 (quoting *Ortiz*, 834 F.3d at 765).

Here, taken as a whole, the evidence indicates that SAIC took its actions because of Vidal-Hallett's documented poor job performance, not because she is a native of Spain. Vidal-Hallett has not met her burden to show that discrimination based on her national origin caused SAIC to place her on a PIP and, ultimately, caused her termination.[2] She presents no arguments and cites no evidence to support Count 1 of her Complaint in response to SAIC's Motion. (*See* dkt. 52).

---

[2] Vidal-Hallett denies that she voluntarily resigned and contends that SAIC constructively discharged her by offering her a false choice at the April 26 meeting to either resign immediately with a severance package or to finish the PIP and risk termination without severance. (*See* dkt. 52 at 5). According to Vidal-Hallett, there was no real choice because SAIC had already decided to terminate her going into the meeting regardless of her performance in the final two weeks of the PIP. (*See id.*) She therefore felt compelled to resign with the severance package. (*Id.*) Constructive discharge occurs when a plaintiff shows "that she was forced to resign because her working conditions [became] so intolerable that a reasonable person would have felt compelled to resign." *Scaife v. U.S. Dep't of Veterans Affs.*, 49 F.4th 1109, 1119 (7th Cir. 2022)). An employee experiences intolerable working conditions when an "employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the [ ] employee resigns." *Id.* The parties dispute whether SAIC's actions in the April 26 meeting would have reasonably communicated that no matter what, Vidal-Hallett would be fired. (*See* dkt. 35-3 ¶ 11 (Buechele admitting that "the situation was trending

7

By contrast, SAIC presents extensive evidence that Vidal-Hallett failed to meet SAIC's legitimate expectations, both before and after putting her on the PIP.[3] Her first supervisor's assessments of her work show middling performance at best. The evaluations from 2015, 2016, and 2017 noted several concerns, including her attention to detail and her communication about the status of her projects with her supervisors. Patterson's March 14 negative performance evaluation is extensive and thorough. It points to many issues with Vidal-Hallett's overall job performance, as well as her performance on specific projects. The review made no mention of problems with her English, written or oral.

Rather, Patterson identified concerning patterns regarding the substance of Vidal-Hallett's communications with her supervisor and other project stakeholders. Vidal-Hallett disagrees with Patterson's evaluation and characterization of her work. But she offers no evidence that these critiques—whether accurate or not—were motivated by discriminatory animus. *See Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957–58 (7th Cir. 2021) ("[T]he question is not whether the ratings were *right* but whether the employer's description of its reasons is *honest*." (quoting *Gustovich v. AT&T Commc'ns, Inc.*, 972 F.2d 845, 848 (7th Cir. 1992) (per curiam))). Mere disagreement with a supervisor's performance evaluations does not establish discriminatory

---

toward termination") *but see* dkt. 59 ¶ 32 ("[W]hen Plaintiff asked if she had any chance if she stayed two more weeks, that Buechele said, 'What have you proved that you can—that if you cannot prove—that you would not prove in the next two weeks?'"). Drawing reasonable inferences in Vidal-Hallett's favor from the undisputed facts, *Lewis*, 36 F.4th at 759, the Court assumes that SAIC constructively discharged her. But because she presented no evidence or argument that discrimination based on her national origin *motivated* this adverse employment action, she cannot prevail on Count I against SAIC's evidence of its nondiscriminatory motive for termination. *See Ortiz*, 834 F.3d at 765.

[3] SAIC contends that Vidal-Hallett has forfeited her discrimination claim at summary judgment by failing to respond to its arguments. But as the moving party, SAIC still bears the burden to show it is entitled to judgment on that count. *See Gerhartz v. Richert*, 779 F.3d 682, 686 (7th Cir. 2015) ("A moving party who fails to discharge this burden is not entitled to summary judgment, even if the nonmovant entirely fails to respond."). Although Vidal-Hallett failed to address SAIC's arguments regarding her discrimination claim in her response to SAIC's Motion for Summary Judgment, the Court must still determine that judgment for SAIC is proper on that count. *See id.* (citing *Johnson v. Gudmundsson*, 35 F.3d 1104, 1112 (7th Cir. 1994)).

motive. *See Abebe*, 35 F.4th at 607 (affirming summary judgment where plaintiff disagreed with supervisor's assessment of her communication skills but offered no contrary evidence).

Only one sentence in the PIP stated an expectation that Vidal-Hallett's writing in project modules be proofed for grammar. In the full context of the March 14 performance review and PIP—which identified five performance gaps, each with several subparts—this isolated comment cannot support a reasonable inference that Patterson placed her on the PIP because of her national origin. On its face, the critique does not even refer to national origin. Vidal-Hallett felt the comment was a discriminatory slight against her accent. A supervisor's comment about a plaintiff's accent making him hard to understand—in conjunction with his admission that he did not want to hire foreigners—might imply discriminatory animus. *See Hasham v. Cal. State Bd. of Equalization*, 200 F.3d 1035, 1044–45 (7th Cir. 2000). But that is a far cry from Patterson's comment about writing, which referenced neither Vidal-Hallett's accent nor her country of origin. This is particularly true when Vidal-Hallett admits that nothing else Patterson ever said or did showed bias against people of Hispanic origin. (Dkt. 53 ¶¶ 44–45). In short, no rational connection exists between the PIP's critiques of Vidal-Hallett's job performance and her contention that Patterson was motivated by discriminatory animus against her as a person of Hispanic origin.

The evidence likewise shows that after enacting the PIP, Vidal-Hallett's supervisors remained unsatisfied with her performance, so they offered her the option to resign with a severance package rather than finish out the PIP with a strong likelihood of termination for cause. There is no evidence that SAIC made her this offer for discriminatory reasons. At their biweekly meetings, Patterson shared her impressions that Vidal-Hallett had made some progress toward meeting SAIC's expectations, but that her performance was still deficient in many areas. While Vidal-Hallett again disagrees with this assessment, she offers no evidence to show they were

pretextual to disguise discriminatory animus. *See Igasaki*, 988 F.3d at 957–58; *Abebe*, 35 F.4th at 607. At one follow-up meeting, Vidal-Hallett felt offended when Buechele asked her if she understood an English colloquialism. Besides the PIP's expectation that she proofread her writing for grammar, this was the only other time that Vidal-Hallett felt discriminated against at SAIC. (Dkt. 53 ¶ 43). She identifies no other evidence of bias against her or of anyone of Hispanic origin. Even granting her view of Buechele's comment as patronizing and insulting, such an isolated comment falls well short of proving discriminatory animus.

Viewed as a whole, the evidence shows that documented, downward-trending job performance triggered the PIP. Vidal-Hallett's supervisors' opinions of her work did not improve during the PIP period, so SAIC opted to incentivize her resignation to avoid her likely termination for cause. Two oblique comments that make no mention of Vidal-Hallett's national origin cannot support an inference that SAIC took its actions for discriminatory rather than legitimate reasons. *See Ortiz*, 834 F.3d at 765.

## II.     Retaliation

Under Title VII, it is unlawful "for an employer to discriminate against any of his employees . . . because he has opposed . . . an unlawful employment practice . . . ." 42 U.S.C. § 2000e-3(a). "To survive summary judgment on a Title VII retaliation claim, an employee 'must produce enough evidence for a reasonable jury to conclude that (1) she engaged in a statutorily protected activity; (2) the [defendant] took a materially adverse action against her; and (3) there existed a but-for causal connection between the two.'" *Abrego v. Wilkie*, 907 F.3d 1004, 1014 (7th Cir. 2018 (quoting *Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 695 (7th Cir. 2017)). The Court "consider[s] the evidence as a whole and conduct[s] a 'straightforward inquiry: Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory

motive caused the [materially adverse action]?'" *Id.* (quoting *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016)); *see also Ortiz*, 834 F.3d at 765. "For the first element—a statutorily protected activity—'[t]he plaintiff must not only have a subjective (sincere, good faith) belief that he opposed an unlawful practice; his belief must also be objectively reasonable, which means that the complaint must involve discrimination that is prohibited by Title VII.'" *Logan v. City of Chicago*, 4 F.4th 529, 538 (7th Cir. 2021) (quoting *Scheidler v. Indiana*, 914 F.3d 535, 542 (7th Cir. 2019)).

Here, Vidal-Hallett did not engage in statutorily protected activity. She argues that she reasonably believed that the PIP's expectation about proofing her writing for grammar was discriminatory and she voiced that complaint with SAIC. She told Patterson in their meeting, "I think this is discriminatory about my way of expressing myself." (Dkt. 35-2 at 67:24–68:1). She then went to Simmons in Human Resources and reported that one of the grounds for the PIP was her alleged deficiencies with English grammar and writing, and that this was unlawful discrimination. (Dkt. 59 ¶ 10; Dkt. 53-2 ¶ 23). A few weeks later, she told Patterson that she felt offended by Buechele's questioning her English ability. (Dkt. 35-2 at 112).

But "[m]erely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient" to show opposition to an unlawful employment practice. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663–64 (7th Cir. 2006). In speaking up about perceived "discrimination" and feeling offended, Vidal-Hallett failed to connect her feeling of mistreatment for her English grammar with her Hispanic national origin. And no connection can be reasonably inferred from the context. Vidal-Hallett speculates that these comments remarked on her accent and status as a non-native English speaker, which bears on her national origin. (Dkt. 52 at 4). But

the PIP specifically discussed her grammar *in writing*. An accent while speaking is irrelevant to written grammar. Even if accent may indicate a person's national origin, Vidal-Hallett provides no evidence that anyone at SAIC ever remarked on her spoken accent.

Moreover, it is not unlawful under Title VII either to expect an employee to avoid grammatical errors in writing or to ask whether she understands an English phrase. *See, e.g.*, *Chhim v. Spring Branch Ind. Sch. Dist.*, 396 F. App'x 73, 74 (5th Cir. 2010) (per curiam) ("A person's language is not a listed category" under Title VII, and language requirements are not "a covert basis for national origin discrimination" absent evidence that discrimination was the purpose or result (citing *Garcia v. Gloor*, 618 F.2d 264, 268, 270 (5th Cir. 1980))); *cf. Mumid v. Abraham Lincoln High Sch.*, 618 F.3d 789, 795 (8th Cir. 2010) (noting that "language and national origin are not interchangeable" in context of Title VI national-origin discrimination claim). While Vidal-Hallett might have believed in good faith that she opposed an unlawful employment practice when she complained of the "discriminatory" remarks, this belief is not objectively reasonable; the remarks did not violate Title VII. They are not connected with protected-class status. *See Logan*, 4 F.4th at 538.

Even if she could show that she engaged in statutorily protected activity, she fails the causation prong of her retaliation claim. According to Vidal-Hallett, the combination of the severance-package offer's timing and suspect reasoning creates an inference of retaliatory motive. "To show causation, employees may point to circumstantial evidence, such as suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Lewis*, 36 F.4th at 761 (internal citations omitted). But "[s]uspicious timing is rarely enough to create a triable issue." *Khungar*, 985 F.3d at 578 (quoting *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009)).

Here, the timing between Vidal-Hallett's purported protected activity and the severance-package offer is not suspicious. She spoke up in the March 14 meeting and then went straight to Human Resources to voice the same complaint. It was not until April 17, more than a month after the March 14 meeting—and after interim follow-up meetings—that Patterson noted Vidal-Hallett's "insubordination and verbal disrespect to me and other staff members." (Dkt. 53 ¶ 31). This observation more closely followed Patterson's realization in early April that Vidal-Hallett had sent surveys to colleagues asking for their opinions on her job performance.[4] (Dkt. 59 ¶ 28). Patterson then told her to not discuss her evaluation or PIP with anyone. (*Id.*) About a week after the April 17 meeting and assessment, SAIC offered Vidal-Hallett the severance package on April 26, about two weeks before the end of the PIP period. The length of time that passed between the complaints and the severance-package offer belies a causal connection between the two events.

Furthermore, SAIC presented evidence that Vidal-Hallett was not meeting the terms of the PIP. In response, Vidal-Hallett cites no additional evidence that SAIC offered the severance package early because of her complaint from six weeks prior. She merely speculates that the timing is "fishy" because SAIC "rush[ed] Plaintiff out of her job before the end of the PIP," and asks "[i]f the termination were truly legitimate, why not fire Plaintiff outright? Why penalize Plaintiff by revoking the severance offer if Plaintiff stays to the end, trying in good faith to save her job for the full sixty days of the PIP?" (Dkt. 52 at 7). But such speculation is insufficient to survive summary judgment where Vidal-Hallett bears the burden of showing causation. *See Khungar*, 985 F.3d at 573.

---

[4] The surveys did not mention any allegations of discrimination; they just stated that Vidal-Hallett intended to use the results to improve her performance in the future. (Dkt. 53 ¶ 29). Sending the surveys, then, cannot be reasonably construed as opposing an unlawful employment practice under Title VII. *See Logan*, 4 F.4th at 538. It is not statutorily protected activity.

SAIC showed downward-trending performance that began before and continued through the PIP. Viewed as a whole, the evidence cannot support a conclusion that SAIC took its actions in retaliation against Vidal-Hallett for complaining about "discriminatory" remarks about her English. *See Ortiz*, 834 F.3d at 765. Further, Vidal-Hallett did not engage in statutorily protected activity by voicing such complaints. Her retaliation claim fails.

CONCLUSION

For these reasons, the Court grants Defendant School of the Art Institute's Motion for Summary Judgment. [61]


Virginia M. Kendall
United States District Judge

Date: July 10, 2023